```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
```

```
┌─────────────────────────────────┐
│                                 │
│  TINA BASNETT,                  │
│                                 │
│             Plaintiff,          │
│                                 │
│      v.                         │
│                                 │
│  COMMISSIONER OF SOCIAL         │
│  SECURITY,                      │
│                                 │
│             Defendant.          │
│                                 │
└─────────────────────────────────┘
```

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 18-4567 (JBS)

**OPINION**

APPEARANCES:

Richard Lowell Frankel, Esq.
BROSS & FRANKEL, PA
725 Kenilworth Avenue
Cherry Hill, NJ 08002
     Attorney for Plaintiff

Stephen M. Ball, Special Assistant U.S. Attorney
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 Spring Garden Street, 6th Floor
Philadelphia, PA 19123
     Attorney for Defendant

**SIMANDLE**, District Judge:

I.    **INTRODUCTION**

     This matter comes before the Court pursuant to 42 U.S.C §

405(g) for review of the final decision of the Commissioner of the

Social Security Administration ("SSA") denying the application of

Plaintiff  Tina  Basnett  ("Plaintiff")  for  Social  Security

Disability Insurance ("SSDI") benefits under Title II of the Social

Security Act, 42 U.S.C. § 401 et seq. Plaintiff, who suffers from

back,  neck,  and  arm  pain,  carpal  tunnel  syndrome,  obesity,  and

other conditions, was denied benefits for the period of disability from September 14, 2009, the alleged onset date of disability, to December 31, 2014, the date Plaintiff was last insured. Administrative Law Judge ("ALJ") Marguerite Toland issued a written decision on June 1, 2016.

In the pending appeal, Plaintiff contends that the ALJ's decision must be reversed and remanded on six grounds. To that end, Plaintiff argues that the ALJ erred by: (1) rejecting and/or failing to identify and explain the weight assigned to the opinions of the treating sources of record; (2) formulating a Residual Functional Capacity ("RFC") that does not contemplate an eight-hour workday or is otherwise incomplete; (3) failing to assign appropriate limitations in Plaintiff's RFC accounting for her carpal tunnel syndrome; (4) finding Plaintiff's mental health issues non-severe at step two; (5) failing to pose a complete hypothetical to the vocational expert; and (6) improperly discounting Plaintiff's subjective complaints of pain. For the reasons that follow, the Court will vacate the ALJ's decision and remand for further proceedings consistent with this Opinion.

## II. BACKGROUND

### A. Procedural History

Plaintiff protectively filed an application for SSDI benefits on September 14, 2009, alleging a disability from February 14, 2009 through December 31, 2014, the date Plaintiff was last insured

(hereinafter, "the Date Last Insured").[1] (R. at 17, 148.) The SSA denied Plaintiff's claim on March 20, 2010. (R. at 200-04.) Plaintiff's claim was again denied upon reconsideration on July 12, 2010. (R. at 149.) A hearing was held before ALJ Jonathan Wesner on May 10, 2011. (R. at 105-48.) On June 9, 2011, ALJ Wesner issued an opinion, denying benefits. (R. at 150-65.)

Thereafter, Plaintiff filed a Request for Review of Hearing Decision with the Appeals Council. (R. at 299.) On November 20, 2012, the Appeals Council granted Plaintiff's request and remanded the matter for further proceedings. (R. at 167-68.) A second hearing was held before ALJ Wesner on April 9, 2013. (R. at 66-104.) On May 9, 2013, ALJ Wesner issued another opinion denying benefits. (R. at 170-93.) Plaintiff again timely filed a Request for Review of Hearing Decision with the Appeals Council. (R at 299.) On December 16, 2014, the Appeals Council again granted Plaintiff's request for review and remanded the matter to a different ALJ for further consideration of Plaintiff's RFC and to

---

[1] The SSDI benefits program "is similar to other insurance programs in that, to qualify, a claimant must have coverage, i.e., be fully insured, at the time of disability . . . [and] [t]he coverage period for an individual extends to his date last insured, which is the last day when he is eligible for [SSDI benefits]." Bulger v. Berryhill, 2018 WL 4680267, at *4 (E.D. Pa. Sept. 28, 2018) (citing 42 U.S.C. §§ 423(a) & (c); 20 C.F.R. §§ 404.101(a), 404.131(a)). "Under 20 C.F.R. § 404.131, [a claimant] is required to establish that he became disabled **prior to** the expiration of his insured status." Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990) (emphasis added).

obtain supplemental evidence from a vocational expert. (R. at 194-97.)

A third hearing was held before ALJ Marguerite Toland on July 23, 2015. (R. at 36-67.) ALJ Toland issued an opinion on June 1, 2016, denying benefits. (R. at 14-26.) Plaintiff again timely filed a Request for Review of Hearing Decision (R. at 345-46) which the Appeals Council denied on January 23, 2018. (R. at 1-5.) This appeal timely follows.

**B.   Personal and Medical History**

Plaintiff was 40 years old on the alleged disability onset date and 45 years old at the time of her third hearing before the ALJ. (R. at 148.) She graduated from high school. (R. at 387.) For more than twenty years, Plaintiff worked as an administrative assistant and case coordinator in the home health care field. (R. at 389.) She stopped working on February 27, 2009. (R. at 127-28.)

1.   <u>Plaintiff's physical impairments and treatment</u>

Plaintiff was diagnosed with carpal tunnel syndrome in November 2007. (R. at 613; <u>see also</u> R. at 646-57.) Following a motor vehicle accident on November 24, 2008, she also began to experience back, neck, and shoulder pain. (R. at 110, 496-500.) Thereafter, she attended physical therapy at Eastern Neurodiagnostic Associates, P.C. three times per week, where she primarily worked with James Ross, P.T. (R. at 516-553.)

Plaintiff began treating for her pain-related symptoms with Dr. Steven J. Scafidi, M.D., on December 1, 2008. (R. at 578.) According to Dr. Scafidi in his report of October 20, 2009, Plaintiff initially visited with him daily, but those visits dropped to once per week. (Id.) Dr. Scafidi assessed Plaintiff with C4-C5 herniated disc, bilateral C5-C6 radiculopathy, right shoulder impingement, reduced spinal ranges of motion, paraspinal muscle spasms, and myofascial pain. (Id.) Dr. Scafidi noted that these findings were supported by a cervical MRI showing the disc damage, an EMG showing the nerve damage, and X-rays showing a reversed cervical curvature. (Id.) He noted that over the year of treatment with medication, physical therapy, chiropractic care, and home rehabilitation, her response so far had been "Poor."[2] (Id.)

On December 16, 2008, Plaintiff underwent a neurological evaluation with Dr. Shiva Gopal, M.D. (R. at 513-15.) Dr. Gopal reported that Plaintiff suffered from "[t]raumatic cervical strain/sprain with radicular features, right greater than left" and "[p]ost-traumatic lumbar sprain/strain with clinical radiculopathy, right greater than left." (R. at 514.) Dr. Gopal also noted that "[Plaintiff's] injuries are acute and she needs to continue with her current chiropractic care" and that "[s]he has

---

[2]     This last word, "Poor," is somewhat obscured at the bottom of the page of R. 578.

prominent upper extremity radicular features which need evaluation with EMG/nerve conduction studies." (Id.) The following month, Plaintiff underwent an EMG and Dr. Gopal diagnosed her with bilateral acute C5-C6 radiculopathy. (R. at 509-10.)

On February 17, 2009, Plaintiff was again evaluated by Dr. Gopal, who opined that Plaintiff's electrodiagnostic studies "reveal the presence of a bilateral cervical radiculopathy and rule out a lumber radiculopathy." (R. at 505-06.) Dr. Gopal recommended that Plaintiff "have a course of soft tissue/myofascial pain management in addition to chiropractic care" and stated, "[e]ventually, I believe she may need interventional pain management to the cervical region depending on the response to her conservative care over the next four weeks." (R. at 506.)

On October 20, 2009, Dr. Scafidi offered an opinion on Plaintiff's functional limitations. (R. at 578-83.) In this opinion, Dr. Scafidi found that Plaintiff was limited to carrying 1-3 pounds, would be limited to less than two hours of standing or walking in an eight-hour workday, and could sit for less than six hours in an eight-hour workday. (R. at 579.) On February 26, 2010, Dr. Scafidi offered a second opinion, this time stating that Plaintiff suffered from moderate to severe pain in the entire spine, shoulders, hips, arms, and legs, with motor weakness in her extremities, as well as moderate to severe sensory loss in the

affected areas. (R. at 589-92.) He also found reduced range of motion and weakness in the shoulders and spine. (R. at 590-91.)

On October 28, 2009, Mr. James F. Ross, a physical therapist who had been treating Plaintiff for about seven months, offered an opinion on Plaintiff's functional limitations. (R. at 516-21.) Having treated Plaintiff for several months, Mr. Ross opined, among other things, that Plaintiff would be limited to less than two hours of standing or walking in an eight-hour workday and less than six hours of sitting in an eight-hour workday. (R. at 517.) He further found that she had no capacity to push or pull, and that her range of motion in the shoulder, cervical, and lumbar spine were significantly reduced with muscle weakness. (R. at 517-19.)

Plaintiff began treating with John Waldron, D.O. in April 2010. (R. at 658-70.) In or around November 2010, Plaintiff visited with Dr. Waldron two to three times per month for her pain-related symptoms. (R. at 689.)

Plaintiff visited with various physicians at Reconstructive Orthopedics several times between late 2010 and early 2011. (R. at 646-657.) There, Plaintiff initially reported to Dr. James A. Sanfilippo, M.D., that, since the November 2008 car accident, she had been experiencing severe pain in the base of her neck, but that recently the pain began to radiate to bilateral shoulders, the anterior portion of her shoulders, and her upper triceps and

deltoid areas. (R. at 650.) Dr. Sanfilippo "urged her to look warily on anybody who wants to operate on her immediately for her cervical spine given the normal MRI and normal x-rays," and referred her for further evaluation of her cervical spine. (R. at 651) The following week, Plaintiff was seen by Dr. Raymond Ropiak, M.D., who noted, "I do believe she has pain but I am unsure as to where it is coming from." (R. at 649.) Dr. Ropiak gave her a cortisone injection into the AC joint and recommended that she continue physical therapy for six weeks. (Id.) At a follow-up appointment on February 9, 2011, Dr. Ropiak diagnosed Plaintiff with cervical strain with neuropathic pain and right AC joint degenerative changes. (R. at 646.) He told Plaintiff, "I really do not have much in the way of treatment for her shoulders as I do not believe that her biggest complaint is coming from the shoulders," and recommended that she follow up with a nonoperative spine doctor, Dr. Andre W. Hu, for her complaints. (R. at 647.) Plaintiff met with Dr. Hu on February 25, 2011. (R. at 656-57.) According to Dr. Hu, "[g]iven the longstanding nature of [Plaintiff's] symptoms, I believe that this is now a chronic issue, and her prognosis is that she is likely stable but not likely to improve substantially into the foreseeable future," and "I think the goal of her rehabilitation at this point is to maintain and improve her functionality, and give her palliative pain control." (R. at 657.)

Plaintiff underwent a Functional Capacity Evaluation with James H. Rushmore, P.T., on February 10, 2011. (R. at 681-88.) In this report, Mr. Rushmore wrote:

> [Plaintiff] demonstrated limitations in fine motor control and mobility/stability. Her performance does not meet her job requirements as reported due to limitations [in] static and dynamic activity. She performed at below a light material handling demand level with sitting, balance, and trunk mobility limitations.

(R. at 681.) Mr. Rushmore also found that Plaintiff would be limited to only occasional (less than 1/3 of an eight-hour work day) sitting, standing, walking, stair climbing, bending, stooping, and overhead reaching, and that she could not squat, crouch, crawl, or kneel at all. (Id.)

On March 1, 2011, Plaintiff visited Advanced Pain Consultants, PA and Dr. Stephen Boyajian, M.D., assessed her with displacement of cervical intervertebral disk, possible underlying facet arthropathy. (R. at 678-69.) He advised Plaintiff to proceed with intralaminar epidural steroid injections under fluoroscopic guidance and, if there is no significant change after the injection, to "proceed with a medial branch block versus a transforaminal epidural steroid injection versus cervical discopathy." (R. at 679.) On March 9, 2011, Plaintiff underwent an interlaminar epidural steroid injection under fluoroscopic guidance at the C7-T1 interspace. (R. at 680.) on March 22, 2011, Plaintiff followed up with Dr. Boyijian, who noted "there has been

no significant improvement of her symptom complex." (R. at 675.)
After undergoing an updated EMG and nerve conduction study,
Plaintiff followed up with Dr. Boyijian again, on April 12, 2011.
(R. at 671-62.) According to Dr. Boyijian, the EMG and nerve
conduction study "was reported as normal without any evidence of
radiculopathy, polyneuropathy or plexopathy." (R. at 671.) He
opined that Plaintiff's symptoms "are more likely myofascial in
nature and not emanating from the cervical spine intervertebral
bulges," and recommended that Plaintiff follow up with Dr. Hu to
"work on the myofascial component to her symptom complex possibly
with some trigger point injections." (Id.)

On May 5, 2011, Dr. Waldron completed a Medical Source
Statement, in which he opined, among other things, that Plaintiff
was limited to walking one block without rest or severe pain, could
stand or walk for less than two hours in an eight-hour workday,
and would be able to sit for less than six hours in an eight-hour
workday. (R. at 696.) He also found that Plaintiff's fatigue "is
present, such as to prevent [her] from performing normal, fulltime
work activities on a frequent . . . basis." (R. at 699.) In an
April 4, 2013 Physician Update Form, Dr. Waldron opined that
Plaintiff was unable to perform any gainful activity on a regular,
sustained basis. (R. at 713.) Plaintiff continued to treat with
Dr. Waldron for her pain-related and other symptoms through at
least late May of 2015. (R. at 714-25, 734-67.)

## 2.   Plaintiff's mental impairments and treatment

Plaintiff treated for several years with Dr. John Waldron, D.O., for anxiety, depression, and sleep disorder. (R. at 603-04, 667, 669, 716-20, 746-50.) In his May 5, 2011 Medical Source Statement described above, Dr. Waldron noted Plaintiff's depression and anxiety and opined that Plaintiff's depression, in particular, was affecting her physical condition. (R. at 689-92.) He indicated Plaintiff's conditions of anxiety and depression, coupled with her pain to prevent her from performing normal work activities frequently. (R. at 690.)

On July 7, 2010, Dr. J. Theodore Brown, Jr., Ph.D., conducted a psychological consultative examination on Plaintiff. (R. at 627.) At the examination, Plaintiff reported that she experienced insomnia due to constant pain and restlessness and stated that she was depressed as a result of her medical condition and related pain. (R. at 627-28.) He noted her medications included citalopram, Lunesta, and Seasonique. (R. at 627.) Dr. Brown diagnosed Plaintiff in 2010 with adjustment disorder with depressed features and pain disorder associated with the general medical condition. (R. at 629.) He assigned Plaintiff a GAF score of 55-60. (Id.)

On March 12, 2015, Dr. Robert J. Waters, Ph.D., conducted a psychological consultative examination of Plaintiff. (R. at 768-70.) At the examination, Plaintiff reported that she had been experiencing depression since 2009, that her depression was

"moderate . . . with medications but severe without medications," and that she was depressed "most days." (R. at 768.) Dr. Waters listed Plaintiff's "Full Scale IQ" as 86, which he classified in the "Low Average range when compared to same age peers." (R. at 768-69.) Dr. Waters also noted that Plaintiff displayed anxiety by shaking during the interview, and that Plaintiff had difficulty sleeping, especially without medication. (R. at 769.) Based on his examination, Dr. Waters diagnosed Plaintiff with adjustment disorder with depressed mood, and opined that "[t]he combination of her physical/medical conditions and to a lesser extent her depression symptomology present her most significant obstacles to adapting to a typical work environment." (R. at 769-70.)

## C.   State Agency Consultants

At the request of the State of New Jersey Department of Labor and Workforce Development Division of Disability Determination Services ("DDS"), orthopedic consultative examiner Dr. Nithyashuba Khona, M.D., evaluated Plaintiff on January 8, 2010. (R. at 584-88.) Plaintiff allegedly reported to Dr. Khona that she could not stand or walk.[3] (R. at 586.) Dr. Khona observed that Plaintiff

---

[3]    This may be a transcription error in Dr. Khona's notes, as Plaintiff has never elsewhere claimed she cannot stand or walk and indeed she walked on her own, without assistance, throughout the examination. Further, of all the medical and consultative reports in this 770-page record, Dr. Khona's report of this single examination stands out as the only one detecting no orthopedic manifestations of her injuries.

could stand and walk and noted that Plaintiff's "lower extremity work up was negative." (Id.) He examined her cervical area, noted she had no complaints of neck pain, and found nothing unusual. (R. at 585.)

On March 20, 2010, Dr. Deogracias Bustos, M.D., a State agency medical consultant, reviewed Plaintiff's medical records and assessed her physical residual functional capacity. (R. at 595-602.) Dr. Bustos opined that Plaintiff could perform light work, including sitting, standing, and walking about six hours per day, and that Plaintiff could frequently lift 10 pounds and occasionally lift 20 pounds. (R. at 596.)

On February 11, 2013, orthopedic consultative examiner Dr. Ronald Bagner, M.D., evaluated Plaintiff. (700-13.) His impression was that Plaintiff has cervical radiculopathy and lumbar radiculopathy (R. at 701), but that she seems to have normal flexion and range of motion in both her neck and lower back. (R. at 700.) He noted she had pain from the cervical area radiating to the lower back and left posterior thigh. (Id.) He opined that Plaintiff could frequently lift and carry 10-20 pounds, sit, stand, or walk for three hours at a time, could sit, stand, or walk for five hours in an eight-hour workday, and could handle frequently bilaterally. (R. at 704, 706.) He also opined that Plaintiff could frequently climb stairs and ramps, balance, stoop, kneel, and

crouch, but could only occasionally climb ladders or scaffolds and crawl. (R. at 709.)

### D. Plaintiff's Statements and Activities

In an Adult Function Report dated October 5, 2009, Plaintiff indicated that her daily activities entail feeding and letting the dog out, showering, eating breakfast, resting and watching television, doing laundry, checking email, eating lunch, napping, and preparing or ordering dinner for her two kids and husband. (R. at 400, 402.) Plaintiff reported that, due to pain in her arms, neck, and shoulders, she had difficulty dressing, bathing, caring for her hair, and shaving her legs. (R. at 401.) She also stated that the pain keeps her awake and that she is only able to sleep about three or four hours per night. (Id.) Plaintiff submitted a second Adult Function Report on May 24, 2010, in which she stated that there were no changes in her daily activities, but that she had begun taking medication for depression. (R. at 454-55.)

Plaintiff testified at three hearings between May 2011 and July 2015. (R. at 33-147.)

At the first hearing, on May 10, 2011, Plaintiff testified that she tried to keep working for several months after the November 2008 car accident, but that by the end of February 2009 she decided to quit her job due to pain in her neck and back. (R. at 127-28.) Plaintiff described her neck and shoulder pain as follows: "It radiated from my neck, down my arms. . . it varies

from like a five sometimes to an eight, depending on what I do that day." (R. at 113.) She described the pain as constant and testified that standing, sitting, and using her arms to do things like household chores would cause her pain level to increase. (R. at 114.) Plaintiff further stated that she received consistent medication and chiropractic care, including trigger point injections and physical therapy, but that she had not experienced significant relief. (R. at 124-26.) She noted that she had been told she was not a candidate for surgery. (R. at 126.)

Regarding her daily activities, Plaintiff testified at the first hearing that she could sit for maybe 30 or 40 minutes at a time before the pressure and aching in her neck and back become intolerable, and that she could walk about a block in 15 minutes. (R. at 114-17.) She also testified that she does not sleep much at night because of her need to constantly reposition, and that her fatigue caused her to need naps during the day. (R. at 119-20, 124).

Plaintiff's husband, Patrick Neil Basnett, also testified under oath at the first hearing. (R. at 129-34.) Mr. Basnett, who had been sequestered during his wife's testimony, explained that his wife could no longer do the things she used to love, like gardening. (R. at 129, 132-33.) He also testified that his wife no longer slept through the night because of her pain and need to readjust all night. (R. at 130.) Mr. Basnett further stated that

his wife was "more emotional" and that "[t]hings get to her more easily." (R. at 131.)

Plaintiff appeared for a second hearing before ALJ Wesner on April 9, 2013. (R. at 66-104.) At this hearing, Plaintiff testified, among other things, that she had not undergone surgery and that she was still unable to return to work. (R. at 70-71.)

On July 23, 2015, Plaintiff appeared at a third hearing before ALJ Toland. (R. at 33-65.) Plaintiff testified that, due to inactivity, she had gained approximately 30 pounds over the past two years. (R. at 40.) She testified that she had problems driving, specifically when backing up and turning her neck. (R. at 41.) Plaintiff also stated that, since the time of ALJ Wesner's second opinion denying benefits, her hands had become worse, and that "my hand twitches if I go to grab something." (R. at 45.)

Regarding her daily activities, Plaintiff again stated that pain in her back limited her ability to sit, stand, and walk. (R. at 50-57.) She also testified that her mental impairments, including her depression, had worsened, and that she was crying every day and having trouble getting out of bed. (R. at 53.)

### E. Vocational Expert Testimony

During Plaintiff's third hearing, ALJ Toland heard testimony from Mary Morocco, a vocational expert. (R. at 58-64.) Based on Plaintiff's testimony, the vocational expert classified her past work as an administrative clerk (DOT 219.362-010), which is

classified as a light and semi-skilled position at the SVP-4 level. (R. at 59.) The ALJ first asked the vocational expert if a hypothetical individual with the following characteristics would be able to perform Plaintiff's past relevant work:

> [L]imited to sedentary work as defined under the DOT. This individual can sit for up to six hours per day, but no more than one hour at a time and then would need to stand or shift positions for up to five minutes per hour while remaining on task; this individual can only occasionally climb ramps and stairs; can only occasionally stoop; this individual can perform no more than frequent handling.

(R. at 60.) The vocational expert opined that such an individual could not perform Plaintiff's past work "base[d] primarily on the exertional limitations." (R. at 60.)

The ALJ asked whether there are any jobs this hypothetical individual could perform. (Id.) The vocational expert opined that such an individual could perform the work of document preparer, of which there are approximately 38,000 jobs in the national economy, charge account clerk, of which there are approximately 196,000 jobs in the national economy, and greeter, of which there are approximately 966,000 jobs in the national economy. (Id.) The ALJ then asked if that same hypothetical individual were additionally limited to no more than frequent handling, would it rule out any of the three jobs the vocational expert had previously described. (R. at 60-61.) The ALJ testified that such a limitation would rule out all three jobs, but that this second hypothetical individual

could still perform the work of a call out operator, of which there are 51,000 jobs in the national economy, telephone quotation clerk, of which there are approximately 960,000 jobs in the national economy, and telephone solicitor, of which there are approximately 245,000 jobs in the national economy. (R. at 61.)

The ALJ asked if it would rule out any of these jobs if the hypothetical individual were limited to "low stress work," which the ALJ defined as "routine work that would not involve a fast production pace or strict production quotas." (R. at 60-61.) The vocational expert testified that it would not. (R. at 60, 62.) According to the vocational expert, for any of these jobs, no employer would tolerate an employee being off task for more than 10% of the work day on a cumulative basis (R. at 62), nor would any employer tolerate absenteeism more than twice a month. (R. at 63.)

**F.   ALJ Decision**

In a written decision dated June 1, 2016, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time between the alleged onset date of disability and the Date Last Insured because, consistent with Plaintiff's age, education, work experience, and RFC, she was capable of performing work as a callout operator or telephone solicitor. (R. at 25.)

At the first stage of the five-step sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since February 27, 2009 through her date last insured of December 31, 2014. (R. at 17.)

Next, at step two, the ALJ determined that Plaintiff had the following "severe" impairments: history of cervical radiculopathy; bulging disc at C5-C6; cervical, thoracic, and lumbosacral sprain; carpal tunnel syndrome; and obesity. (Id.) The ALJ found Plaintiff's depression to be "non-severe" because it "does not cause more than minimal limitations in [Plaintiff's] ability to perform mental work activities." (R. at 18.) In reaching this conclusion, the ALJ assigned great weight to the opinions of Dr. Brown, Dr. Waters, and the State agency consultant, and also considered "the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments . . . known as the 'paragraph B' criteria." (Id.) The ALJ also found that Plaintiff's "hand twitches" were "a symptom, and not a medical impairment." (R. at 19.)

At step three, the ALJ concluded that none of Plaintiff's impairments or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including those set forth in Listings 1.02, 1.04, and 11.14. (R. at 19-20.)

Between steps three and four, the ALJ determined that through the Date Last Insured, Plaintiff possessed the RFC to perform "sedentary work," as defined in 20 C.F.R. § 404.1567(a), except that:

> [Plaintiff] can sit up to six hours per day but no more than one hour at a time; and then would need to stand or shift positions for five minutes every hour while remaining on task. She can occasionally climb ramps and stairs. She can occasionally stoop. She can perform no more than frequent handling. She is limited to low stress work (defined as routine work that would not involve a fast production rate pace or strict production quotas). She would be off-task 5% of the workday, in addition to normal breaks, due to symptoms.

(R. at 20-21.) In determining Plaintiff's RFC, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. at 21.) Although the ALJ found that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," she concluded that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. at 23.)

In crafting the RFC, the ALJ analyzed the medical evidence in the record with respect to each of Plaintiff's impairments and considered the opinions of various treating physicians and State agency medical consultants. (R. at 21-23.) The ALJ assigned "great weight" to the opinions of orthopedic consultative examiner Dr.

Khona and the State agency medical consultants "to the extent that they show that [Plaintiff] was not significantly limited by her neck, shoulder, and back pain, consistent with the record as a whole. (R. at 22.) The ALJ also gave "some weight" to the opinions of the "treating physicians," including Dr. Waldon, "as they do indicate some limitation from [Plaintiff's] physical impairments as reflected in the medical record and in [Plaintiff's] subjective complaints." (Id.) Notably, as discussed in Section IV.B.1, infra, the ALJ never explicitly identified the medical opinions of treating physician Dr. Scafidi, nor did she explain the weight assigned to those specific opinions.

Based on Plaintiff's RFC and the vocational expert's testimony from the September 2016 hearing, the ALJ found, at step four, that Plaintiff was unable to perform her past relevant work as an administrative clerk. (R. at 23-24.) At step five, the ALJ determined that there exists a significant number of jobs in the national economy that Plaintiff can perform, including those of callout operator (51,000 jobs in the national economy) and telephone solicitor (245,000 jobs in the national economy). Accordingly, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, from February 27, 2009 through December 31, 2014. (R. at 25.)

### III. STANDARD OF REVIEW

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); see also Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec. Admin., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971); see also Hagans v. Comm'r of Soc. Sec. Admin., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson). Therefore, if the ALJ's findings of fact are supported by substantial evidence, those findings bind the reviewing court, whether or not it would have made the same determination. Fargnoli, 247 F.3d at 38. The Court may not weigh the evidence or substitute its own conclusions for those of the ALJ. Chandler v. Comm'r of Soc. Sec. Admin., 667 F.3d 356, 359 (3d Cir. 2011). Remand is not required where it would not affect the outcome of the case. Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

## IV. DISCUSSION

### A. Legal Standard for Determination of Disability

In order to establish a disability for the purpose of disability insurance benefits, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Plummer v. Apfel, 186 F.3d 422, 426 (3d Cir. 1999); 42 U.S.C. § 423(d)(1). A claimant lacks the ability to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Plummer, 186 F.3d at 427-428; 42 U.S.C. § 423(d)(2)(A).

The Commissioner reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." 20 C.F.R. § 1520(b). Present engagement in substantial activity precludes an award of disability benefits. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment." 20 C.F.R. § 1520(c). Impairments lacking sufficient severity render the claimant ineligible for disability benefits. See

Plummer, 186 F.3d at 428. Step three requires the Commissioner to compare medical evidence of the claimant's impairment(s) to the list of impairments presumptively severe enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Between steps three and four, the ALJ determines the claimant's RFC. 20 C.F.R. § 404.1545. Step four requires the ALJ to consider whether, based on his or her RFC, the claimant retains the ability to perform past relevant work. 20 C.F.R. § 1520(e). If the claimant's impairments render the claimant unable to return to the claimant's prior occupation, at step five the ALJ will consider whether the claimant possesses the capability to perform other work existing in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 1520(g), 404.1560(c).

**B.  Analysis**

Plaintiff argues that the ALJ erred by: (1) rejecting and/or failing to identify and explain the weight assigned to the opinions of the treating sources of record; (2) formulating a Residual Functional Capacity ("RFC") that does not contemplate an eight-hour workday or is otherwise incomplete; (3) failing to assign appropriate limitations in Plaintiff's RFC accounting for her carpal tunnel syndrome; (4) finding Plaintiff's mental health

24

issues non-severe at step two; (5) failing to pose a complete hypothetical to the vocational expert; and (6) improperly discounting Plaintiff's subjective complaints of pain. The Court agrees that the ALJ erred by failing to identify and adequately explain the weight assigned to the opinions of the treating sources of record, including the opinions of Dr. Scafidi, and, relatedly, that the ALJ's formulation of the RFC does not properly contemplate an eight-hour work day or is otherwise incomplete.[4]

> 1. The ALJ erred by not adequately explaining her dismissal of the opinions of Dr. Scafidi

In reaching her conclusion that Plaintiff was capable of performing the RFC set forth in the ALJ's decision, the ALJ weighed the opinions of several medical professionals, including Plaintiff's "treating physicians." (R. at 22.) The ALJ named Dr. Waldron as one of those "treating physicians" and explained some of her reasons for discounting Dr. Waldron's opinions. (Id.) But the ALJ did not explicitly identify treating physician Dr. Scafidi by name, nor did she explain the weight assigned to any of his opinions. (Id.) The ALJ also did not identify or weigh the opinions of Plaintiff's treating physical therapists. (Id.) Plaintiff argues that the ALJ erred in formulating Plaintiff's RFC by

---

[4] Because remand is necessitated on these two grounds, the Court need not reach Plaintiff's remaining arguments. On remand, the Court invites the ALJ to fully consider and/or address Plaintiff's other concerns.

rejecting and/or failing to adequately explain her decision to discount those medical opinions. (Pl.'s Br. at 17-19.) The Court finds that the ALJ erred in her consideration of Dr. Scafidi and other treating sources, especially including Dr. Waldron, who had longer-term familiarity with Plaintiff's physical and mental health conditions; and will remand on this basis.[5]

The Court is mindful that "the ALJ — not treating or examining physicians or State agency consultants — must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361; see also 20 C.F.R §§ 404.1527(e)(1). Furthermore, while an ALJ must consider the opinions of treating physicians, "[t]he law is clear

---

[5]    With respect to Dr. Waldron, the Court finds that, unlike Dr. Scafidi, the ALJ at least mentioned she was discounting his opinions. (R. at 22.) On remand, however, the Court invites the ALJ to reassess Dr. Waldron's opinions, including that Plaintiff's fatigue "is present, such as to prevent [her] from performing normal, fulltime work activities on a frequent . . . basis" (R. at 699), and that Plaintiff was unable to perform any gainful activity on a regular, sustained basis. (R. at 713.)

Plaintiff also argues that the ALJ failed to properly consider the treatment notes and opinions of Plaintiff's physical therapists, Mr. Ross and Mr. Rushmore. (Pl.'s Br. at 17-19.) But a physical therapist is not an "acceptable medical source" to "provide evidence to establish an impairment," as defined in 20 C.F.R. § 416.913(a) and 20 C.F.R. § 404.1513(a). Instead, a physical therapist's opinion is an "other source," which "may be used to show the severity of [a claimant's] symptoms and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d). Accordingly, "[s]tatements from a physical therapist are entitled to consideration as additional evidence, but are not entitled to controlling weight." Hatton v. Comm'r of Soc. Sec. Admin., 131 F. App'x 877, 878 (3d Cir.2005) (citing 20 C.F.R. § 404.1513(d)). Thus, the ALJ did not err in considering the physical therapists' treatment notes and not affording them controlling weight.

26

. . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity" where it is not well supported or there is contradictory evidence. <u>Chandler</u>, 667 F.3d at 361 (alteration in original) (quoting <u>Brown v. Astrue</u>, 649 F.3d 193, 197 n.2 (3d Cir. 2011)); <u>see also</u> <u>Coleman v. Comm'r. of Soc. Sec. Admin.</u>, 494 F. App'x 252, 254 (3d Cir. 2012) ("Where, as here, the opinion of treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason.") (quoting <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000)).

On the other hand, treating physicians' reports "should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" <u>Plummer</u>, 186 F.3d at 429. Moreover, "[s]ince it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3d Cir. 1981) (internal citation omitted).

As noted above, the ALJ did not explicitly identify treating physician Dr. Scafidi by name, nor did she specifically explain the weight assigned to any of his opinions. Instead, the ALJ

generally noted that, "[f]rom 2009 through 2015, treating physicians opined that [Plaintiff] could perform less than sedentary work due to her pain and fatigue." (Id.) (citing several exhibits, including Dr. Scafidi's treatment notes and opinions). The ALJ then gave "some weight" to the opinions of "the treating physicians" "as they do indicate some limitation from [Plaintiff's physical impairments as reflected in the medical record and in [Plaintiff's] subjective complaints." (R. at 22.) But nowhere does the ALJ mention Dr. Scafidi or discuss in any detail his opinions, including, among other things, that Plaintiff would be limited to **less than** six hours of sitting in an eight-hour workday. (R. at 579.) Dr. Scafidi's opinion is plainly inconsistent with the ALJ's ultimate RFC determination that Plaintiff could sit for **up to** six hours in an eight-hour workday. (R. at 20-21.) The ALJ, however, has not provided any identifiable bases for rejecting Dr. Scafidi's opinions, which are consistent with those of treating physician Dr. Waldron (see, e.g., R. at 696, 699, 713), nor has she cited any specific contradictory medical evidence to account for this discrepancy.

This oversight requires remand for further consideration. On remand, the ALJ must, at a minimum, fully evaluate the medical opinions of Dr. Scafidi and other treating physicians, including Dr. Waldron. If the ALJ determines that those medical opinions should be discounted or rejected, the ALJ must cite "**specific**

contradictory medical evidence that supports her decision for doing so." Ruberti v. Comm'r of Soc. Sec. Admin., 2017 WL 6492017, at *8 (D.N.J. Dec. 19, 2017) (emphasis in original).

> 2. The ALJ's formulation of Plaintiff's RFC does not contemplate an eight-hour workday or is otherwise incomplete

Plaintiff also argues, among other things, that the ALJ erred by failing to contemplate an eight-hour workday in Plaintiff's RFC. (Pl.'s Br. at 19-20.) For the reasons discussed below, the Court finds that the ALJ's assessment of Plaintiff's RFC does not clearly account for an eight-hour workday and will remand for clarification.

The ALJ found at step two that Plaintiff suffered from several "severe" impairments, including a history of cervical radiculopathy, bulging disc at C5-C6, cervical, thoracic, and lumbosacral sprain, carpal tunnel syndrome, and obesity (R. at 17), and determined between steps three and four that Plaintiff possessed the RFC to perform "sedentary work," as defined in 20 C.F.R. § 404.1567(a), except that:

> [Plaintiff] can sit up to six hours per day but no more than one hour at a time; and then would need to stand or shift positions for five minutes every hour while remaining on task. She can occasionally climb ramps and stairs. She can occasionally stoop. She can perform no more than frequent handling. She is limited to low stress work (defined as routine work that would not involve a fast production rate pace or strict production quotas). She would be off-task 5% of the workday, in addition to normal breaks, due to symptoms.

(R. at 20-21.)

Notably, this assessment of Plaintiff's RFC does not include any description of how long the Plaintiff could stand or walk or what activity she would be capable of performing beyond those six hours of sitting at one time. Even assuming that Plaintiff could sit for up to six hours, was able to stand for five additional minutes every hour for six hours (approximately 30 minutes), would be off-task for 5% of the workday (approximately 24 minutes), and took "normal breaks," it is not clear the RFC accounts for a full eight-hour workday, as required by SSR 96-8p. This is especially so because, as Plaintiff argues, the ALJ never asked the vocational expert to define "normal breaks." (Pl.'s Br. at 14-17.) Accordingly, the Court will remand to give the ALJ an opportunity to provide a more complete assessment of Plaintiff's RFC.

**V.   CONCLUSION**

For the foregoing reasons, the ALJ's decision will be vacated and the Court will remand for further proceedings. An accompanying order will be entered.


**March 26, 2019**                    **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      U.S. District Judge